**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

METAL MANAGEMENT MISSISSIPPI,
INC.                                                                                    PLAINTIFF

V.                                                   CIVIL ACTION NO. 3:08-CV-00431 HTW-LRA

GOVERNOR HALEY BARBOUR,
In His Official Capacity Only as
Governor of Mississippi                                                      DEFENDANT

## ORDER DENYING INJUNCTIVE RELIEF

Before this court is plaintiff's motion for injunctive relief in the form of a temporary restraining order and/or a preliminary injunction [**Docket No. 2**].  Here, plaintiff Metal Management Mississippi, Inc., ("Metal Management") asks this court to enjoin the enforcement portions of Mississippi Senate Bill No. 2006 ("Act"), an Act to amend MISS. CODE ANN. § 97-17-71 and to expand the types of metal regulated by the law. Metal Management, part of an interstate and global commerce  scrap metal recycling industry, contends that unless injunctive relief is provided by this court that Metal Management will suffer irreparable harm from the enforcement of the new Act. Complaining of a potpourri of harms, Metal Management says that the new Act's three-day "tag and hold" provision violates the Commerce Clause of the Constitution of the United States, Article I, Section 8, clause 3;[1] that the Takings Clause of the Fifth

---

[1] Article I, Section 8, clause 3 of the Constitution of the United States provides that Congress has the power, "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes; ...

Amendment is similarly violated by this provision;[2] that the Act's requirement barring scrap metal dealers from purchasing scrap metal with cash offends the Legal Tender Provisions of the Constitution of the United States, Article I, Section 8, clause 5 and Article I, Section 10;[3] that the administrative search provisions of the Act run afoul of the protections afforded by the Fourth Amendment to the United States Constitution;[4] and that the Act's creation of a *prima facie* presumption that a business guilty of failure to keep records required by the new Act and in possession of stolen property, had knowledge that said property had been stolen.

The defendant here is Governor Haley Barbour, in his official capacity as Governor of the State of Mississippi.  On June 8, 2008, Governor Barbour signed this legislation into law after its passage by the Mississippi Legislature.  The Act was scheduled to go into effect on August 8, 2008, but this court moved that date until August 13, 2008, to allow this court to study the arguments of the parties.  The defendant challenges each complaint raised by plaintiff and contends that the Act is

---

[2]The "Takings Clause" of the Fifth Amendment states that, "nor shall private property be taken for public use without just compensation."

[3]Article I, Section 8, clause 5 vests Congress with the power, "[t]o coin Money, regulate the Value thereof, and of foreign Coin, and fix the Standard of Weights and Measures;

Article I, Section 10, clause 1 provides that, "[n]o State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility."

[4]The Fourth Amendment to the Constitution of the United States provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

constitutional and should be permitted to go into effect.

Others have expressed interest in this court's resolution of the issues herein and whether this Act should be allowed to take effect.  The court has heard from the Institute of Scrap Recycling Industries, supporting plaintiff with their authorities of law and argument.  The court has heard from Mississippi Power Company, Entergy Mississippi, Inc., Home Builders Association of Mississippi, the Jackson Residential Investment Group, and the Mississippi Malt Beverage Association, all supporting the defendant.

On August 4, 2008, this court heard oral arguments from the parties and, thereafter, requested additional briefing on a few points.  The court has now received that additional briefing and is prepared to issue its ruling.

## I.  **Legislative Backdrop**

The Act in question is a response to criminal activity.  The State of Mississippi has experienced a disturbing epidemic of theft of various metals, metals the State fears have been sold to businesses in the scrap metal recycling industry where the stolen metals may be quickly crushed, baled and sold.  In addition, some fear that Mississippi has now become a magnet for out-of-state metal thieves who travel to Mississippi to unload their stolen wares because Alabama, Louisiana and Tennessee all have new, tougher legislation regulating transactions involving scrap metal dealers.

## II.  **Factual Background**

Mississippi Senate Bill No. 2006 which was scheduled to become effective on August 8, 2008, prior to the Stay Order imposed by this court, regulates sales of copper

3

and certain other aluminum and non-ferrous metals, while excluding aluminum cans and certain ferrous metals not listed in the new Act.  The new Act will require businesses such as the plaintiff's and others involved with the scrap metal trade to register with the office of the Mississippi Secretary of State; to keep records of scrap metal transactions; and to operate between the hours of 9:00 a.m. and 6:00 p.m. daily. The new Act will require such businesses to obtain the name, address and age of each person from whom metal is purchased from the person's identification card; to scan a copy of the person's identification card; to photograph or videotape the person selling the scrap metal and the material being sold; to record the date and place of acquisition; to record the weight, quantity and volume of each purchase;  to record the seller's vehicle license tag number; and to obtain a signed statement from the person receiving consideration in the transaction that he is the rightful owner of the metal being sold. The requirement to photograph or videotape the person receiving consideration and the metal involved in the transaction also provides that the date and time must appear on the image taken.

After purchasing the metal, the commodities business will be required to hold the metal purchased in such a manner as to be identifiable and separate from the metal obtained in other transactions for three (3) business days from the date of purchase. This period may be extended to fifteen (15) days if law enforcement officers have evidence to show that the metal may be stolen property.

Payment for scrap metal covered by Senate Bill No. 2006 cannot be by cash but must be made by check issued to the seller of the metal, made payable to the name and address of the seller and mailed to the recorded address of the seller, or by

4

electronic funds transfer.  Payment shall not be made for a period of three (3) days after the purchase transaction.

### III.  Plaintiff's Objections to Senate Bill No. 2006

The plaintiff explains that it currently purchases, sorts and bales scrap metal for sale and is part of an industry which ships such in interstate and a global stream of commerce.  For example, says plaintiff, as part of this global stream of commerce, the United States exported over $15.7 billion in scrap metal in the year 2006, with China being the largest purchaser.  Metal commodities, says plaintiff, are traded on the London and New York Mercantile Exchanges, a circumstance which oftentimes results in volatile prices on a daily basis.  If required to hold a significant quantity of metal pursuant to the requirements of Senate Bill No. 2006, the plaintiff says it could be affected adversely by the unpredictable, volatility of the price market.

The plaintiff says that it may receive as much as 330,000 pounds of non-ferrous metal in its various locations throughout Mississippi over a three-day period, estimating that it conducts scrap metal transactions with over 49,000 businesses and individuals per year.  The requirement that metal commodities businesses be required to tag and hold all purchases for three days, says plaintiff, is not economically feasible because of current space limitations and a lack of unused land which will be alleviated only by drastic expansion of their facilities in order to accommodate the hold periods imposed by the Act.  The plaintiff estimates that it will need a new area the size of two football fields in order to comply with the tag and hold requirement.  If the new areas are to be covered and secured, says plaintiff, at least one such commodity business, Shemper & Sons of Hattiesburg, Mississippi, has estimated that it will need a 23,500 square foot

5

storage building which will cost over $500,000.00.

The three-day hold requirement, says plaintiff, further will prohibit sorting the metal by type, thereby also prohibiting sale and delivery of particular metals in accordance with the bale method currently being employed by the industry. Moreover, if an extended administrative hold of fifteen days is required by a law enforcement official having reasonable cause to believe that a particular transaction involves stolen goods, the process of sales and shipping will be further impaired.

The plaintiff also objects to payments being made by check or electronic transfer payable to the business selling the metal. The plaintiff notes that the industry has a tradition of dealing in cash which expedites its operations, and that restricting the method of payment in this manner will further impede its normal operations.

The plaintiff also complains that Senate Bill No. 2006 imposes an unconstitutional presumption of guilty knowledge where stolen goods are involved and where the required records are not kept in strict accordance with the law. Plaintiff contends that this is a mandatory presumption condemned by applicable law.

The plaintiff says that it, and other similar commodities businesses, will suffer irreparable harm if forced to comply with the tag and hold requirement of Senate Bill No. 2006. The tag and hold requirement, says plaintiff, as well as the limitation of payment except by check, money order or electronic transfer, impose excessive and impermissible burdens on interstate commerce and an impermissible taking of property, all in violation of the Constitution of the United States.

The plaintiff also asserts that the tag and hold requirement of the Bill will not assist law enforcement because setting aside and holding each metal transaction will

only increase the opportunity for theft to occur because most scrap metal businesses do not have the capability of securing the product during the hold period.

### IV.  The Defendant's Response in Support of Senate Bill No. 2006

The defendant responds that Senate Bill No. 2006 is identical in most respects to regulations upheld as constitutional by federal and state courts across the country over the last century.  The constitutionality of regulations such as the Bill in question, says the defendant, was settled in the first half of the twentieth century, as shown by several unsuccessful challenges to this type legislation.  The defendant refers to 45 A.L.R.2d 1391 § 13-14, citing the cases which upheld junk dealer regulations and observing that, "...  the later decisions have uniformly upheld statutes and ordinances requiring junk dealers to retain for a specified time goods purchased by them."

Very recently, adds the defendant, a federal court in the Western District of Tennessee, Western Division, in *Tennessee Scrap Recyclers Association, et al. v. Phil Bredesen, Governor of the State of Tennessee, et al.*, Civil Action No. 2:08-cv-2073, decided June 3, 2008, denied a motion by scrap metal dealers for a preliminary injunction against similar legislation in Memphis, Tennessee.   According to defendant, having failed to achieve a victory there, the plaintiff herein has filed this lawsuit alleging the same grounds relied upon in that litigation.

Senate Bill No. 2006, says defendant, contrary to plaintiff's protestations, does not discriminate against interstate commerce in favor of intrastate commerce.  The tag and hold provision of the Bill, argues the defendant, is not a direct regulation on interstate commerce which is intended to stop the sale of metal commodities in the

interstate or global market.  Further, says defendant, the alleged burdensome requirements of the new law are merely incidental and not excessive.  Senate Bill No. 2006 serves a vital state interest, says defendant, because it will deter metal theft and facilitate the recovery of stolen metal.  So, argues the defendant, the economic risks and additional costs which the plaintiff claims will befall the industry are not matters contemplated by the Commerce Clause of the Constitution of the United States.

The defendant also argues that law enforcement will benefit greatly from the tag and hold provision of the Act since dealers will be more careful about purchasing suspect material and because, once purchased, each transaction can be inspected based on reports from the victims of metal theft.

## V.  Standard For Granting Injunctive Relief

Rule 65(a) of the Federal Rules of Civil Procedure authorizes the district courts to issue a preliminary injunction after notice to the adverse party in order to protect a plaintiff from irreparable injury and to preserve judicial power to render a decision after trial on the merits.  *Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).  "The grant or denial of a preliminary injunction rests in the discretion of the district court."  *Id*. Rule 65(b) of the Federal Rules of Civil Procedure permits this court to issue a temporary restraining order if, "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant," without the requested relief.   Injunctive relief is an "extraordinary remedy," and a court's decision to grant preliminary injunctive relief is "the exception rather than the rule." *Karaha Bodas Co. v. Negara*, 335 F.3d 357, 363-64 (5th Cir. 2003) (quoting *Miss.*

*Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985)).

In order to obtain injunctive relief, a plaintiff must satisfy the stringent test set forth in *Miss. Power & Light Co. v. United Gas Pipe Co.*, 760 F.2d 618 (5th Cir.1985) (citing *Canal Auth. of State Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974)).  The granting or denial of a motion for a temporary restraining order rests in the sound discretion of the trial court.  *Canal Auth.,* 489 F.2d at 572.  The movant bears the burden of satisfying four prerequisites for the extraordinary relief of a temporary restraining order.  *Id.* at 572.  The movant must prove: (1) a substantial likelihood of success on the merits; (2) failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction will cause to the adverse party; and (4) that issuance of the injunction will not disserve the public interest.  *Id.* at 572.  These requirements are not balanced, but rather each one must be met before the court can grant such a drastic remedy as a temporary restraining order.  *Miss. Power & Light Co.,* 760 F.2d at 621.  In considering these four prerequisites, the court must bear in mind that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion.  The primary justification for applying this remedy is to preserve the court's ability to render a meaningful decision on the merits. *Canal Auth.,* 489 F.2d at 573.  If the movant fails clearly to carry its burden with respect to any one of the four criteria, then the preliminary injunction shall be denied.  *Black Fire Fighters Ass'n v. City of Dallas, Tex.*, 905 F.2d 63, 65 (5th Cir. 1990).

# VI. <u>Analysis</u>

## A. Success on the Merits

In order to prevail on a request for temporary restraining order and/or a preliminary injunction, the movant's likelihood of success on the merits must be more than negligible. *Compact Van Equip. Co., Inc. v. Leggett & Platt, Inc.*, 566 F.2d 952, 954 (5th Cir. 1978). Injunctive relief should not be granted unless the question presented by the movant is free from doubt. *Congress of Racial Equality v. Douglas*, 318 F.2d 95, 97 (5th Cir.), *cert. denied*, 375 U.S. 829 (1963).

Plaintiff has raised a number of challenges to the Act. The court will consider each in turn.

## 1. The Commerce Clause

The plaintiff contends that the State of Mississippi, by requiring the plaintiff and businesses similarly situated to tag and hold incoming scrap metal for three days or longer, has enacted regulatory legislation which directly restricts the plaintiff's privilege of engaging in interstate commerce. This court is not persuaded to accept the plaintiff's contention.

Article I, Section 8 , clause three of the United States Constitution grants Congress the power "[t]o regulate Commerce ... among the several States ... ." This provision of the United States Constitution provides the primary thrust of the plaintiff's constitutional claims. Courts interpreting the Commerce Clause have held that "although the Clause is phrased as an affirmative grant of congressional power, it ... [also] contains a negative or 'dormant' aspect that 'denies the States the power

unjustifiably to discriminate against or burden the interstate flow of articles of commerce.' " *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *Wyoming v. Oklahoma*, 502 U.S. 437, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992).  The United States Supreme Court has held that the primary purpose of this dormant aspect of the Commerce Clause is to "preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *General Motors Corp. v. Tracy*, 519 U.S. 278, 299, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997); namely to prohibit economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.  *Wyoming v. Oklahoma,* 502 U.S. at 454.

To determine whether a law violates this so-called dormant aspect of the Commerce Clause, the United States Supreme Court has adopted a two-tiered approach to analyzing state economic regulations under the Commerce Clause.  Under this approach, the courts classify state statutes into one of two categories: those state statutes which facially discriminate against out-of-state economic interests, or those state statutes which regulate evenhandedly and thereby evince only an indirect burden on interstate commerce.  *Dickerson v. Bailey,* 336 F.3d 388, 396 (5th Cir. 2003), citing *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986).

Thus, the courts first ask whether the contested legislation discriminates on its face against interstate commerce.  *Am. Trucking Assoc., Inc. v. Michigan Pub. Serv.*

11

*Comm'n*, 545 U.S. 429, 433, 125 S.Ct. 2419, 162 L.Ed.2d 407 (2005).  State laws

discriminating against interstate commerce in favor of intrastate commerce are *per se*

*invalid.  Dickerson v. Bailey*, 336 F.3d 388, 395 (5th Cir. 2003).  The state law will be

unconstitutional unless the state actor "can demonstrate, under rigorous scrutiny, that it

has no other means to advance a legitimate local interest."  *Id.*  "At a minimum, such

facial discrimination invokes the strictest scrutiny of any purported legitimate local

purpose and of the absence of nondiscriminatory alternatives."  *Hughes v. Oklahoma*,

441 U.S. 322, 337, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979).

　　　If the law in question is not facially discriminatory, then the court moves to the

second tier of the analysis.  At this second level involving statutes that effectuate a

legitimate local interest and that only incidentally affect interstate commerce, the courts

evaluate such by applying a "balancing test" between the alleged burdens and benefits

associated with the legislation.  The courts will uphold such statutes unless the burden

it imposes on interstate commerce is "clearly excessive in relation to the putative local

benefits."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 847, 25 L.Ed.2d 174

(1970) (the "Pike balancing test").

　　　This court finds that the new Act in the instant case is not facially discriminatory.

This Act does not mandate "differential treatment of in-state and out-of-state economic

interests that benefits the former and burdens the latter."  *Granholm v. Heald*, 544 U.S.

460, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005) (quoting *Oregon Waste Sys., Inc. v. Dep't*

*of Envtl. Quality of Or.*, 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)).

　　　Next, this court applies the Pike case balancing test.  A state law which does not

facially discriminate against out-of-state interests and only incidentally affects interstate commerce will be upheld unless the burden it imposes on interstate commerce is "clearly excessive in relation to the putative local benefits."  *Pike*, 90 S.Ct. at 847. The defendant in the instant case clearly has a legitimate local purpose:  to bring illegal non-ferrous scrap metal sales in Mississippi under control.

To succeed in this challenge of the new Act under the Pike balancing test, the plaintiff must show that the new Act has "a disparate impact on interstate commerce." *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Regional Solid Waste Mgmt. Auth.,* 389 F.3d 491, 502 (5th Cir. 2004).  The "incidental burdens to which *Pike* refers are the burdens on interstate commerce that exceed the burdens on intrastate commerce." *Id.*  "Where a regulation does not have this disparate impact on interstate commerce, then (this court) must conclude that ... [the Act] has not imposed any incidental burdens on interstate commerce" and, therefore, that it passes the *Pike* test.  *Id.*

The burdens imposed by the new Act in the instant case fall upon transactions conducted with intrastate scrap metal dealers.  This court at this point simply is not persuaded by the plaintiff's assertions that the interstate and global stream of scrap metal will be curtailed by the tag and hold provision of the new Act as to constitute an impermissible burden on interstate commerce.

Next, this court is mindful that the task of the Commerce Clause is to create an open and efficient interstate market.  *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 328, 97 S.Ct. 599, 606, 50 L.Ed.2d 514 (1977).  The Commerce Clause protects markets from being excessively burdened and does not protect particular

businesses from regulation.  *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117,

127, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978).

This court is further mindful that, unlike private enterprise, government is vested

with the responsibility of protecting the health, safety, and welfare of its citizens.  *Metro.*

*Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728

(1985).  Laws favoring local government interests over business interests may be

directed toward any number of legitimate goals wholly unrelated to protectionism.

*United Haulers Assoc., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, ___ U.S.

___, 127 S.Ct. 1786, 1796, 167 L.Ed.2d 655 (2007).

Therefore, this court is not persuaded that the plaintiff has established that any

burdens imposed by the new Act outweigh the benefits provided to the public by the

new Act's provisions.  Consequently, this court cannot conclude that the plaintiff is likely

to succeed on this issue and injunctive relief on this issue must be denied.

## 2.  The Fifth Amendment Takings Clause Claim

The Takings Clause of the Fifth Amendment is made applicable to the States

through the Fourteenth Amendment and directs that "private property shall not be taken

for public use without just compensation."  *Urban Developers LLC v. City of Jackson,*

*Miss.*, 468 F.3d 281, 292 (5th Cir. 2006) (citing *Chicago, B. & Q.R. Co.  v. Chicago*, 166

U.S. 226, 17 S.Ct. 581, 584, 41 L.Ed. 979 (1897)).

Subsection (3) of Section 1 of Senate Bill No. 2006 calls for the purchaser of

metal property to "tag and hold" the metal property separate and identifiable from other

purchases for not less than three (3) business days from the date of purchase.  Metal

Management says this provision seizes private property without compensation in violation of the Fifth[5] and Fourteenth[6] Amendment to the United States Constitution and Section 17 of the Mississippi Constitution of 1890.[7]

Plaintiff says the implementation of this provision will require it, and other commodity businesses similarly situated, to increase the physical size of their businesses with additional real estate and/or storage buildings at great cost in order to store the large number of transactions accumulated during the hold period and exponentially increase plaintiff's exposure to market risks.

Certainly, the new Act's provisions may impede the plaintiff's established methods of operation.  Incidental impediments on the use of property, however, must be distinguished from more substantial effects that require compensation.  *Peterman v. Coleman*, 764 F.2d 1416, 1418 (11th Cir.1985) (holding that a five-day holding period did not amount to a taking).  "Acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision."  *Id.* at 1418 (citing *N. Transp. Co. v. City of Chicago*, 99 U.S.

---

[5]U. S. Const. amend. V, in pertinent part says: "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

[6]U.S. Const. amend. XIV, in pertinent part says: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

[7]Article 3, Section 17, of the Constitution of Mississippi provides in relevant part that "[p]rivate property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law; ... "

635, 642, 25 L.Ed. 336 (1879)).

Subsection (3) of Section 1 of Senate Bill No. 2006 does not prohibit the transfer of title at any time.  The new Act requires as a first step that the plaintiff retain physical possession until the required three-day hold period has expired.  Title still may be transferred.

Although the court realizes that the prices of scrap metals are volatile, the court does not consider the statute's "tag and hold" period to be a taking under the Constitution.  Even if the scrap metal suffers a diminution in value during the hold period, "such an effect is too incidental to amount to a taking for which compensation is owed under the Constitution."  *Peterman*, 764 F.2d at 1419.  The incidental impediment permitted by Subsection (3) of Section 1 of Senate Bill No. 2006 is reasonable in light of the compelling state interest in impeding the sale of stolen goods.  The state interests advanced by the Senate Bill (deterring theft and recovery of stolen property) are compelling.  The hold period provision is central to the crime control purpose of the statute.  Having the recyclers hold the scrap metal on site allows law enforcement and property owners an opportunity to investigate and retrieve their property.  Therefore, this court concludes that the hold period does not constitute a "taking" under either the Fifth or Fourteenth Amendments.

### 3.  The Administrative Inspection Provisions

The plaintiff contends that the administrative inspections permitted by the new Act violate the Fourth Amendment to the Constitution of the United States.  Mississippi Senate Bill No. 2006 authorizes a law enforcement officer, during customary business

hours, to "inspect all purchased metal property in the possession of the scrap metal dealer," and to review the records that the regulated business is required to maintain.

The Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes.  An owner or operator of a business, thus, has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable.  This expectation exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes.  An expectation of privacy in commercial premises, however, is different from, and less than, a similar expectation in an individual's home.  This expectation is particularly attenuated in commercial property employed in closely regulated industries.  Certain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise.  *New York v. Burger*, 482 U.S. 691, 700, 107 S.Ct. 2636, 2642 (1987), and cases cited therein.  For instance, the liquor industry, firearms and mining industries have long been subject to similar close supervision and inspection. *Id.*

In the instant case, the plaintiff will be required to collect and record the name, address and age of the seller;  the date and place of the purchase;  the weight , quantity and general physical description of the metal;  the amount of consideration given; and the vehicle license tag of the seller.  These records may be inspected by law enforcement during customary business hours.  The United States Supreme Court recognizes that warrantless inspections of  closely regulated businesses is permissible if three criteria are met.  First, there must be a substantial governmental interest that

17

informs the regulatory scheme.  Second, the inspection must be necessary to further

the regulatory scheme, and third, the regulatory statute itself must perform the two

basic functions of a warrant: (1), advise the owner of the commercial premises

that the search is being conducted pursuant to law and have a properly defined

scope, and (2),  it must limit the discretion of the inspectors.  *Burger*, 482 U.S. at 702-

03.

As noted by the defendant, the Fourth and Eleventh Circuits, as well as a recent

district court opinion, have affirmed the constitutionality of warrantless search statutes

for scrap and junk dealers.  *Peterman*, 764 F.2d at 1420-21; *Gallaher v. City of

Huntington*, 759 F .2d 1155, 1158-59 (4th Cir. 1985); *Second Hand Tunes v. City of

Chicago*, 231 F.Supp. 784, 793-94 (N.D. Ill. 2002).

The defendant further notes that scrap metal businesses such as the plaintiff's

are closely regulated under the new Act, as well as the prior law.  Closely regulated

businesses are characterized by licensing, registration, maintenance of records, and

criminal penalties.  *Burger*, 482 U.S. at 703-04;  *Peterman*, 764 F.2d at 1421.

Furthermore, says defendant, reducing metal theft crime, protecting theft victims, and

recovering stolen goods from scrap dealers all constitute substantial governmental

interests, thereby satisfying the first prong of the *Burger* test.  *Id.*  Secondly, says

defendant, warrantless inspections are necessary in this instance in order to deter and

detect crime.  Thirdly, says defendant, the government's discretion is limited to

searching only records and inventory during customary business hours.  Moreover, the

new Act limits the scope of inspection to mandatory records and inventory on premises.

Based on the foregoing, this court is not persuaded that the plaintiff has shown likelihood of success on its Fourth Amendment argument.  At this juncture of the lawsuit, this court is persuaded that the new Act meets the constitutional standards set forth in *New York v. Burger* and that no basis for granting injunctive relief on the plaintiff's Fourth Amendment claim has been substantiated.

### 4.  The Legal Tender Claim

The plaintiff argues that by barring scrap metal dealers from purchasing scrap metal with cash, Senate Bill No. 2006 § 4[8] violates the legal tender provisions encoded in U.S. Const. art. 1, § 8, cl. 5[9] and U.S. Const. art. I, § 10, para. 1.[10]  Congress, in full accordance with its Constitutional authority, has established that Federal Reserve notes are legal tender.  Title 31 U.S.C. 5103;[11] *Julliard v. Greenman* ("The Legal-Tender Cases"), 110 U.S. 421, 447-48, 4 S.Ct. 122, 28 L.Ed. 204 (1884) (holding that Congress has the power of making notes of the United States a legal tender in payment of private debts, and that such power is not restricted by the fact that its exercise may

---

[8] Senate Bill No. 2006 § 4 provides that the "payment for scrap metal [...] must be made by check or money order, mailed to the business address of the company for whom the metal is being sold, and the name of the company must be the payee on the check."

[9] U.S. Const. art. 1, § 8, cl. 5 states that "The Congress shall have Power [...] To coin Money[.]"

[10] U.S. Const. art. I, § 10, para. 1 states, in pertinent part: "No State shall [...] make any Thing but gold and silver Coin a Tender in Payment of Debts."

[11] Title 31 U.S.C. § 5103 provides, in pertinent part, that "United States coins and currency (including Federal reserve notes and circulating notes of Federal reserve banks and national banks) are legal tender for all debts, public charges, taxes, and dues."

affect the value of private contracts); *Foret v. Wilson*, 725 F.2d 254 (5th Cir. 1984) (per curiam) (holding that the plaintiff's "argument, that only gold and silver coin may be constituted legal tender by the United States, is hopeless and frivolous[.]");  *see also Mathes v. Comm'r of Internal Revenue*, 576 F.2d 70 (5th Cir. 1978).

State and federal court jurisprudence has held, though, that while the states must not infringe upon Congress' exclusive right to declare what constitutes legal tender, a state may declare what manner of payment of legal tender is permissible or required for particular types of transactions.  *Genesee Scrap & Tin Baling Co. v. City of Rochester*, 2008 U.S. Dist. LEXIS 43364, at *10-13 (W.D.N.Y. June 3, 2008);  *Berry v. Hannigan*, 9 Cal. Rptr. 2d 213, 214-16 (Cal. Ct. App. 1992) (upholding a California statute which required vehicle-towing companies to accept credit cards because "[t]he legislation simply requires that towing and storage facilities accept credit cards as a *manner* of paying legal tender") (emphasis added); *Cade v. Montgomery County*, 575 A.2d 744, 749-50 (Md. Ct. Spec. App. 1990) ("The circuit court's determination that the provision at issue represents merely an alternative manner of 'cash' payment, rather than establishing a substitute form of legal tender, was correct"); *Seidman v. The Ins. Comm'r of the Commw. Of Pa.*, 532 A.2d 917 (Pa. Commw. Ct. 1987) ("[R]equiring a producer to only accept premium deposits for insurance coverage under the Pennsylvania Automobile Insurance Plan in the form of postal money orders, cashier's checks, certified checks and personal checks is not the equivalent of a state making 'legal tender'"); *see also Porter v. City of Atlanta*, 384 S.E.2d 631, 634 (Ga. 1989).

Moreover, vouchers, checks, and money orders represent promises to pay legal tender, namely, United States currency.  *See Nixon v. The Individual Head of the St. Joseph Mortgage Co.*, 615 F. Supp. 898, 900 (N.D. Ind. 1985).

In *Genesee,* a case that is factually analogous to the one at bar, the plaintiff challenged a city ordinance that required scrap metal processors to use only checks to purchase scrap metal. *Genesee*, 2008 U.S. Dist. LEXIS 43364, at *1-2.  There, the plaintiff argued that the ordinance in question violated U.S. Const. art. 1, § 8, cl. 5 and Title 31 U.S.C. § 5103.  *Genesee*, 2008 U.S. Dist. LEXIS 43364, at *2.  The *Genesee* court rejected the plaintiff's argument, finding that the ordinance was "neither unconstitutional nor in conflict with Section 5103."  *Id.* at 10-13.  Analyzing cases from a variety of jurisdictions, the court held that "checks are not legal tender in themselves, and cannot be lawfully be made such by state or municipality fiat."  *Id.* at 9.  The court further held that checks "may, however, be used as a substitute for legal tender, because the payee ultimately has the right to present the check to a bank and redeem it for cash in the form of United States currency."  *Id.*  Thus, the court upheld the ordinance because "all the [o]rdinance [did was] specify the *form* in which payments for a particular category of transactions are to be made."  *Id.*  ("The buyer must pay by check, but that check is a promise of payment in legal tender, upon presentation of the check to a bank").

This court finds the aforementioned authorities persuasive.  Senate Bill No. 2006 § 4 does not attempt to declare checks and money orders legal tender.  The statute

21

simply limits the manner of payment of legal tender for scrap metal purchases. *Genesee*, 2008 U.S. Dist. LEXIS 43364, at \*10-13.  As such, Senate Bill No. 2006 § 4 does not offend the U.S. Const. art. 1, § 8, cl. 5; U.S. Const. art. I, § 10, para. 1; or Title 31 U.S.C. 5103.  Therefore, this court finds that Metal Management has failed to demonstrate a likelihood of success as to its legal tender claims.

### 5.  Impermissible Shifting of Burden of Proof

Section (e)(6)(e)(9) of Senate Bill No. 2006 provides that, "[i]f a person acquiring metal property fails to maintain the records or to hold such materials for the period of time prescribed by this section, such failure shall be prima facie evidence that the person receiving the metal property received it knowing to be stolen or in violation of Section 97-17-70."  The plaintiff contends that this "prima facie" provision constitutes an unlawful mandatory presumption in violation of both the due process provisions of the United States Constitution and the Mississippi Constitution.[12]

"The United States Supreme Court categorizes presumptions as either permissive inferences or mandatory presumptions.  *Francis v. Franklin*, 471 U.S. 307,

---

[12]Article 3, Section 14 of the Mississippi Constitution gives the same due process rights as the Fourteenth Amendment to the United States Constitution. *Walters v. Blackledge*, 220 Miss. 485, 71 So.2d 433 (1954) (the due process required by the Federal Constitution is the same 'due process of law' which is required by Section 14 of the Constitution of the State of Mississippi." *See also Nat'l Collegiate Athletic Ass'n v. Gillard*, 352 So.2d 1072 (1977) (the basic decision of the case then is the simple statement that Gillard's "right" to engage in intercollegiate football is not a "property" right that falls within the due process clause of either Section 14 of the Mississippi Constitution or the Fourteenth Amendment of the United States Constitution, both of which are identical.)

313-314, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).  A mandatory presumption is one that instructs a criminal jury that it must infer the presumed fact if the state proves the predicate fact, or facts, and is unconstitutional.  *Coleman v. Butler*, 816 F.2d 1046, 1048 (5th Cir. 1987).  "A mandatory presumption ... may affect not only the strength of the 'no reasonable doubt' burden but also the placement of that burden; it tells the trier that he or she must find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts."  *County Court of Ulster County v. Allen*, 442 U.S. 140, 157, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

On the other hand, a permissive inference or presumption "allows – but does not require – the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant.  In that situation, the basic fact may constitute prima facie evidence of the elemental fact.  Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference."  *County Court of Ulster County v. Allen*, 442 U.S. at 157.  Thus, permissive presumptions can only shift the burden of proof if the inference (as applied) is irrational, because only then could permissive presumptions cause a jury to reach an erroneous factfinding under the appropriate burden of proof.  *Coleman v. Butler*, 816 F.2d at 1055.  Moreover, "a truly permissive

presumption cannot (by itself) have the requisite inferential strength, even if wholly unrebutted, on which to infer guilt beyond a reasonable doubt.  Permissive presumptions allegedly serve only to suggest rational (at minimum) inferences to which a jury might attribute varying degrees of evidentiary weight (empirical likelihood) based on the proof at trial."  *Id.*

In this court's view, the "prima facie evidence" provision of the new Act rises only to the level of a permissive inference and is not a mandatory presumption.  The State of Mississippi recognizes a number of permissive presumptions, to-wit:  Miss. Code ANN. § 97-23-93 (2008) (shoplifting); Miss. Code ANN. § 97-19-57 (2008) (false pretenses); and Miss. Code ANN. § 97-23-93(2) (possession of recent stolen property).  Thus, this court finds that injunctive relief predicated on this claim would not be appropriate.

## B.  IRREPARABLE HARM

Irreparable harm requires a showing that: (1) the harm to the plaintiff is imminent; (2) the injury would be irreparable; and (3) that the plaintiff has no other adequate legal remedy.  *See Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975).  "It is not so much the magnitude of the harm claimed by Plaintiff but the irreparability that counts for purposes of a preliminary injunction."  *Canal Auth.,* 489 F.2d at 575.  "The key word ... is irreparable."  *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975).  The Fifth Circuit has found an injury to be irreparable if it cannot be undone through monetary relief. *DFW Metro Line Servs. v. Sw. Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir.1990);  *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472-73 (5th Cir.

1985).  Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant.  *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985), citing *Carter v. Heard*, 593 F.2d 10, 12 (5th Cir. 1979).  Finally, irreparable harm must be proven separately and convincingly, or no injunction may issue.  The burden of proof is not reduced by either the existence of an extremely strong likelihood of success on the merits or the egregiousness of the alleged wrong upon which the underlying claim is based.  *White v. Carlucci*, 862 F.2d 1209, 1212 (5th Cir. 1989).

The irreparable harm asserted by the plaintiff consists of claims that additional real estate will be needed in order to comply with the tag and hold provision of the new Act, additional storage facilities, and extensive security measures.  Additionally, says plaintiff, some such businesses may have to cease operation because they will be unable to comply.

The new Act regulates the manner and cost of doing business in the scrap metal trade and will undoubtedly alter such and in so doing may impose a burden on the plaintiff's economic activity.  Still, any such new costs such as the cost of purchasing or renting real estate, the cost of obtaining security services, the cost of obtaining storage buildings (measured in the plaintiff's submissions to be near $500,000.00) are all measurable and capable of being compensated by monetary damages.  The possibility that the plaintiff may go out of business is unsupported by any competent proof and is only alluded to as a mere possibility.  Injuries adequately remedied by monetary

damages are not irreparable, *DFW Metro Line Services*, 901 F.2d at 1269, and speculative assertions of injuries fail to clearly establish irreparable harm. *Holland*, 777 F.2d at 997.

The plaintiff's main contention, however, is its reliance on its constitutional attack upon the Act. Plaintiff points out that violation of a constitutional right is irreparable harm even for minimum periods of time. *Hill v. Greene Co. School District*, 848 F.Supp. 697 (S.D. Miss. 1994). This court has not agreed with plaintiff at this point that the Act is constitutionally unsound. Therefore, this court is not satisfied that the requisite showing of irreparable harm has been made so as to establish entitlement to preliminary injunctive relief.

## C.  BALANCE OF HARMS

The next task under *Callaway* is to balance the harm. First, the plaintiff must show that the threatened injury outweighs any damage that the injunction would cause to the adverse party. And next, the plaintiff must show that issuance of the injunction would not impact adversely on the public interest. *Miss. Power & Light,* 760 F.2d at 626. This court has considered the impact of this legislation from the perspectives of the various parties. Although plaintiff has argued that the Act in question is afflicted with constitutional maladies, this court, thus far, is not so persuaded. Thus, at this stage, this court is not persuaded that the Act violates the Commerce Clause or that it constitutes an unconstitutional taking. Nor is this court persuaded that the Act is a template for unconstitutional administrative searches or a foe of the Legal Tender laws.

26

Juxtaposed against this finding at this preliminary stage is the court's recognition that the Act energizes crime-fighting features which aim to medicate a criminal sore on the State's body.  This weighing disfavors issuance of the injunction.

Then, there is the matter of the law's effectiveness.  Plaintiff claims that issuing an injunction will not disserve the public interest because the tag and hold provision of the Act will not deter crime but, in fact, will increase crime.  Plaintiff says that the industry will not have the funds to hire proper security to protect accumulated metals over the three-day tag and hold period when in the absence of such regulation the industry would have disposed of such.  The plaintiff also submits that issuance of the injunction will further the public interest by ensuring that the environmental benefits of scrap metal recycling are not impaired because recyclers are forced out of business.

On the first point above, whether the Act will be effective, the parties submitted supportive affidavits.  The plaintiff submitted the affidavit of Malcolm McMillan, Chief of Police for Jackson, Mississippi, and Sheriff for Hinds County, Mississippi.  He opines that the law will not effectively reduce copper thievery.  His affidavit is contradicted by the affidavits of Gary Looney, Chief of Police of Byhalia, Mississippi, and Tim Perkins, Sheriff of Amite County, Mississippi, and President of the Sheriffs' Association. Plaintiff's allegation relative to the environment is based primarily on argument and not sharply defined by differing affidavits.

This court finds, after weighing the various arguments on this balance of harms, that plaintiff's arguments at this stage come up short and fail to persuade.  Should the

court grant the injunction, the public will be denied a law enforcement hammer which could strike at the criminal menace sought to be controlled, namely the theft of targeted metals and their consequential anonymous quick cash sale to largely unregulated metal recyclers.  Therefore, while this court is cognizant of the financial harm the plaintiff may suffer in regard to complying with the new Act, this court is persuaded that the defendant's duty to protect the public in this instance outweighs such harm.

## CONCLUSION

Preventing and dealing with crime is much more the business of the States than it is of the Federal Government.  *Irvine v. California*, 347 U.S. 128, 134, 74 S.Ct. 381, 384, 98 L.Ed. 561 (1954).  This court, sitting in review of the constitutionality of a state's law enforcement and crime prevention measure, must not lightly construe the United States Constitution so as to intrude upon the administration of justice by the individual States.  States are empowered  to regulate procedures under which their laws are carried out unless the method of regulation "... offends some principle of justice so rooted in the traditions and conscience of the people as to be ranked as fundamental." *See Speiser v. Randall*, 357 U.S. 513, 523, 78 S.Ct. 1332, 1341, 2 L.Ed.2d 1460 (1958); *Leland v. Oregon*, 343 U.S. 790, 798, 72 S.Ct. 1002, 1007, 96 L.Ed. 1302 (1952); and *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934).  Thus far, this court is not so convinced.  Therefore, this court, for all the

reasons stated herein, finds that the plaintiff's request for injunctive relief is not well taken and is hereby denied.

**SO ORDERED** this the 13th day of August, 2008.

**s/ HENRY T. WINGATE**
**CHIEF UNITED STATES DISTRICT JUDGE**

CIVIL ACTION NO. 3:08-CV-00431 HTW-LRA
Order denying injunctive relief